1

2

3

4

5

6

7

8                              IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PAMELA WALL,[1] individually
     and on behalf of all those
11   similarly situated,

12              Plaintiff,                        CIV. NO. S-05-2553 FCD GGH
                vs.
13
     MICHAEL O. LEAVITT,
14
                Defendant.                        FINDINGS AND RECOMMENDATIONS;
15   _____/            ORDER

16   _Introduction and Summary_

17              This case brought as a potential class action, involving the reimbursement of

18   Medicare from payments made by "primary payers" under the Medicare Secondary Payment Act

19   (MSP), has been referred to the undersigned pursuant to E. D. Local Rule 72-302(a).  Previously

20   pending on this court's law and motion calendar for September 18, 2008, was defendant's motion

21   for summary judgment, filed August 1, 2008.  Kelli Taylor appeared on behalf of defendant.

22   Martha Bronson represented plaintiff.

23              The procedural path of this case to this point has not been easily traversed; a

24   complete explanation will be given _infra_ as to how this case has arrived at this point, as this

25   _____

26        [1]  Former plaintiff CARES, Inc. was dismissed by stipulated order on November 1, 2007.

                                                 1

1  explanation will aid in determining where the case goes from here.  In sum, by Order of March

2  18, 2008, this initial stage of the summary judgment process was limited to the following issues:

3       Whether the Secretary (Medicare) has any policies as described above which

4       permit him to deprive Medicare beneficiaries of their monies received from [non-

5       Medicare sources, aka "primary payer"],[2] not subject to Medicare reimbursement,

6       prior to the occurrence of meaningful due process; and

7       Whether any [formal] pre-deprivation due process is necessary in any event.

8       The parties have understandably and correctly interpreted the scope of the above

9  directive insofar as the parties recognize that the nature of MSP monies reimburseable to

10  Medicare, as opposed to non-MSP monies to which Medicare is not entitled, is not always

11  discernible with pinpoint accuracy at the time a Medicare beneficiary becomes entitled to a

12  settlement check (or some other source of income) which in whole or in part is meant to

13  encompass medical expenses previously "conditionally" paid by Medicare.  Thus, this motion for

14  summary judgment involves the acquisition and retention by Medicare of: (1) disputed MSP

15  monies, i.e., monies over which Medicare has a possible claim for reimbursement and (2) non-

16  MSP monies, i.e., monies recovered in settlement or elsewhere over which there could be no

17  reasonable contention that Medicare has some claim, yet nevertheless retained by Medicare, prior

18  to the time formal due process procedures are available.   This motion therefore involves the

19  Third Cause of Action in the complaint, and parts of the First Cause of Action.[3]

20  \\\\\

---

22     [2] The court and Medicare have used different terminology for those persons/entities who make payments to persons, part or all of which are subject to the Medicare Secondary Payer statute.  Previously, the undersigned referred to them as "secondary payers," and the Secretary refers to them as "primary payers."  The undersigned will adopt the Secretary's terminology herein.

25     [3] The Third Cause of Action sets forth at para. 61:
The defendant Secretary unlawfully allowed and allows.... [Medicare] to take possession of and retain, indefinitely, medicare beneficiaries' third party proceeds under the guise of an MSP claim and without reasonable cause to believe the proceeds are related to a MSP claim.

1    The undersigned finds herein that plaintiff has raised an arguable due process

2    claim, but ultimately finds that the Secretary's MSP procedures involved in plaintiff's case are

3    *not* unconstitutional from a due process standpoint.  Partial summary judgment should be

4    awarded to the Secretary, i.e., on the Third Cause of Action, and part of the First Cause of

5    Action.

6    *Procedural Facts*

7    This case involves a proposed class action lawsuit filed on December 15, 2005,

8    wherein plaintiff Wall[4] seeks to represent those individuals who have had problems obtaining

9    return of their third party personal injury settlement proceeds which they claim are being

10   unlawfully retained and used by Medicare.  The gist of the Third Cause of Action (the heart of

11   this case) alleged that when Medicare believed that it was entitled to reimbursement from

12   beneficiaries or their payment sources, on account of medical benefits paid or "advanced" by

13   Medicare (which ought to have been paid by the payment source), it compelled the payment

14   source or beneficiary to turn over all of the monies received from the payment source regardless

15   of the monies ultimate potential for reimbursement.  In other words, as alleged, Medicare had a

16   "give it all the money first, and we will finally figure it out later approach."  In the remaining

17   causes of action, plaintiff also alleges problems in the informal and formal due process

18   procedures as applied.  She seeks to enjoin the Secretary from certain pre and post-deprivation

19   due process practices in regard to this Medicare reimbursement program, or at least have them

20   declared invalid.  The Complaint does *not* seek back benefits, future benefits, or damages.

21   Because district courts generally have jurisdiction only to review "final," i.e., fully

22   exhausted, claims against the Secretary, a lengthy process ensued to determine the court's

23   jurisdiction.  In Findings and Recommendations (F&Rs) dated July 11, 2007, the undersigned

24   found that *based on the allegations of the complaint,* plaintiff was primarily attacking Medicare

25

26   _____

[4]   Hereafter, all references to plaintiff pertain to Pamela Wall.

1   reimbursement policies and procedures – she was not seeking entitlement to benefits either past

2   or prospective.  The Honorable Frank Damrell adopted these Findings on August 16, 2007.  The

3   undersigned also finds that the issues presented by *this* motion are not moot.[5]

4   At one point, it became necessary to rule on plaintiff's counsel's (Bronson's)

5   ability to continue with the case in that she was a witness to conversations which took place

6   between her and the Medicare contractor (UGS) personnel, especially Brent Price.  In order to

7   remain in the case as lawyer, plaintiff's counsel agreed (1) to strike paragraph 39 from the

8   complaint in which characterizations of the counsel/Price conversations appear; (2) be prohibited

9   herself from rebutting Brent Price's testimony; (3) plaintiff's counsel letters could only be used

10  by plaintiff for purposes of showing notice, but not in regard to the letters' substance.  Order filed

11  November 29, 2007.  This order has significant effect when dealing with the Price declaration.

12  It is effectively unrebutted insofar as his dealings with plaintiff's counsel.

13

---

14  [5] At least with respect to the issues on this summary judgment, the court finds that
     plaintiff's case is not moot, which issue is controlled by cases such as <u>Gerstein v. Pugh</u>, 420 U.S.
15  103, 95 S.Ct. 854 (1975).  In <u>Gerstein</u>, a case brought as a class action involving the need for a
     judicial determination of probable cause for pretrial detention, the Supreme Court found at 420
16  U.S. at 110, n.11, 95 S.Ct. at 861, n.11:

17          The claim, in short, is one that is distinctly 'capable of repetition, yet evading
             review.' At the time the complaint was filed, the named respondents were
18          members of a class of persons detained without a judicial probable cause
             determination, but the record does not indicate whether any of them were still in
19          custody awaiting trial when the District Court certified the class. Such a showing
             ordinarily would be required to avoid mootness under <u>Sosna</u>. But this case is a
20          suitable exception to that requirement.  <u>See</u> <u>Sosna</u>, <u>supra</u>, 419 U.S. at 402 n. 11,
             95 S.Ct. at 559 n. 11; cf. <u>Rivera v. Freeman</u>, 469 F.2d 1159, 1162-1163 (CA9
21          1972). The length of pretrial custody cannot be ascertained at the outset, and it
             may be ended at any time by release on recognizance, dismissal of the charges, or
22          a guilty plea, as well as by acquittal or conviction after trial. It is by no means
             certain that any given individual, named as plaintiff, would be in pretrial custody
23          long enough for a district judge to certify the class. Moreover, in this case the
             constant existence of a class of persons suffering the deprivation is certain. The
24          attorney representing the named respondents is a public defender, and we can
             safely assume that he has other clients with a continuing live interest in the case.
25  This case is similar in that if medicare has a "take-it-all-now-give-back-some-later" policy, such
     is certain to reoccur on a daily basis.  Nevertheless, it would be difficult for these people to get
     into court before mootness would again arise.  <u>See also</u> <u>United States v. Howard</u>, 480 F.3d 1005,
26  1010 (9th Cir. 2007) (involving shackling of pre-trial detainees in court proceedings).

1    The case thereafter proceeded with much difficulty on its way to an initial class

2    certification motion.  When the motion was finally heard, the undersigned ultimately found that

3    the motion was not well supported, but in all probability, the post-deprivation due process issues

4    were not susceptible of class treatment, i.e., the regulations "as-applied" due process claims

5    would be based on highly different facts.  Order filed March 18, 2008.  Rather than permit an

6    immediate second go at establishing the class action prerequisites, the undersigned believed that

7    it would be more efficient to determine whether the facial pre-deprivation due process claims, the

8    ones most likely susceptible to class action treatment, could survive a motion for summary

9    judgment.  If the claims could not, the need for a further class action hearing could well

10   evaporate.

11   Counsel for plaintiff was given initial deadlines to file for summary judgment and

12   extensions of time with respect to the deadlines.  Nevertheless, as set forth in Order of August

13   19, 2008, the undersigned was compelled to strike plaintiff's tardy and non-compliant motion for

14   summary judgment.  Plaintiff then attempted to file a "motion for injunctive relief" in its place,

15   but as this was simply a summary judgment motion in disguise, this motion too was stricken.

16   Order filed September 5, 2008.  The case then proceeded on the Secretary's motion for summary

17   judgment.[6]

18   _Legal Standards for Summary Judgment Motions_

19   The "purpose of summary judgment is to 'pierce the pleadings and to assess the

20   proof in order to see whether there is a genuine need for trial.'"  Matsushita Elec. Indus. Co. v.

21   Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P.

22   56(e) advisory committee note to 1963 amendment).  Summary judgment is appropriate "if . . .

23

24        [6] Plaintiff was not precluded from opposing the Secretary's motion by virtue of plaintiff's
     affirmative motions being stricken.  Because the undersigned recommends that the Secretary's
25   motion be granted, the striking of plaintiff's motions has little practical effect.  Hopefully, it
     sends a message to plaintiff's counsel that repeated non-compliance with a court's orders will not
26   be tolerated.

there is no genuine issue as to any material fact, and . . . the moving party is entitled to judgment as a matter of law." Rule 56(c). Disputed facts must be material (affecting the outcome of the suit under the governing law), and genuine (supported by evidence permitting a reasonable jury to return a favorable verdict). Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

The moving party:

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Rule 56(c)).

The moving party without the burden of proof at trial may rely "solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Id. (citations omitted.) That party need only point to the absence of a genuine material factual issue, and is not required to produce evidence negating the opponent's claim. Id. at 323-24; Lujan v. National Wildlife Fed'n, 497 U.S. 871, 885, 110 S. Ct. 3177, 3187 (1990).

When the moving party meets its responsibility, the burden shifts to the opposing party. Matsushita, 475 U.S. at 586, 106 S. Ct. at 1356. The opposing party then must submit "significant probative evidence" on each element of his claims on which he bears the burden at trial.[7] Barnett v. Centoni, 31 F.3d 813, 815 (9th Cir. 1994). Unverified denials in pleadings are insufficient. Neither can conclusory statements defeat a properly supported motion. Scott v. Rosenberg, 702 F.2d 1263, 1271-72 (9th Cir. 1983). Rather, specific facts in the form of affidavits or admissible discovery material must be submitted. Rule 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n.11.

---

[7] "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322.

1    The opposing party need not conclusively establish any fact.  To demonstrate a

2    genuine dispute, however, the opposing party "must do more than simply show that there is some

3    metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead

4    a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

5    Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).  In other words, the evidence

6    must demonstrate that a trial is required to resolve the parties' differing versions of the truth.

7    T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

8    The court believes the evidence of the opposing party, Anderson, 477 U.S. at 255,

9    106 S. Ct. at 2513, and draws all reasonable inferences in its favor, Matsushita, 475 U.S. at 587,

10   106 S. Ct. at1356.  Nevertheless, inferences are not drawn out of the air, and the opposing party

11   must produce a factual predicate from which to draw an inference.  Richards v. Nielsen Freight

12   Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985).

13   *Discussion*

14      A.  Evidentiary Objections

15   Both parties object to the other's evidence – and then some.  Plaintiff objects to

16   numerous exhibits which were part of the administrative record in this case – unless it had been

17   written by plaintiff's counsel.  The Secretary seeks to obliterate any evidence produced by

18   plaintiff.

19   Those objections have been considered.  For the reasons set forth by the Secretary

20   in opposition to plaintiff's objections, each is overruled.  Moreover, this court previously ruled

21   that the Secretary was authorized to use certain letters and case documents without challenge

22   because the Secretary was precluded from deposing plaintiff's counsel.  Order, filed November

23   29, 2007, at 4.  Plaintiff was permitted to use certain letters which would normally require

24   counsel's deposition for the purpose only of giving notice or indication of demands made, but for

25   no other substantive purpose.  Id.

26   \\\\\

7

The Secretary's primary objection to plaintiff's evidence concerns the declaration of Randy Singleton.  The Secretary first alleges lack of disclosure of this witness as an expert witness.  However, the undersigned will not strike the declaration on this basis.  For the most part, Singleton recounted his knowledge of Medicare policies and procedures with which he was familiar having worked at the MSPRC in the aspect of recovering "overpayments" from beneficiaries whose medical bills had been paid for by Medicare, but who had received payment from a primary insurer/entity for such expenses.  It is arguable that simply explaining what one learned as an agency employee is not the type of testimony for which expert disclosure is necessary.  Certainly, the Secretary's declarants, especially Thomas Bosserman, do the same thing.

The Secretary's objections to Singleton's relevance as a witness have more merit. Singleton worked for an unknown time with the MSPRC, which was a national contractor involved in recovering monies under the MSP program, and which took over all of this business from the regional contractors (such as the one involving plaintiff – UGS) in October 2006.  Thus, not all the policies and practice of MSPRC are necessarily pertinent to what UGS was doing in 2004-2005; in any event, Singleton would lack foundation to discuss the "old policies."  The undersigned has discounted Singleton's testimony in the text on this basis where appropriate.

Plaintiff Wall's declaration also has some problems in that her level of knowledge and sophistication with respect to Medicare procedures certainly "improved" from that evident in her deposition.  There are parts of the declaration which were written to take the place of counsel's substantive declaration because counsel has been prohibited from testifying in this case.  However, for the reasons set forth in the text, the Wall declaration is not additive in light of the other evidence in the case, or is otherwise immaterial to the issues discussed herein.  The undersigned has not utilized the declaration for any dispositive  purpose.

Finally, the numerous "me too" attorney declarations filed by plaintiff, acquired from attorneys around the country, are conclusory at best, and not instructive to the issues

1   discussed herein.  For the reasons discussed in the text, they are completely discounted.

2          Unless otherwise noted herein, any other of the Secretary's objections are

3   overruled.[8]

4          B. <u>Facts Related to Plaintiff Wall's Pre-Deprivation Due Process Claim</u>

5          As set forth previously, the court has required that this summary judgment motion

6   be made specific to plaintiff herself.  Of course, findings here may have great implication for

7   potential class issues involving the same subject, if not dispositive significance for the putative

8   class.  It may be that assuming certain issues in plaintiff's favor, plaintiff cannot prevail as a

9   matter of law, which would be determinative of any similarly situated class member regardless of

10  whether a class had been previously certified.  In the abstract, it is possible when adjudicating the

11  named plaintiff's claim first, that a resolution would simply allow the case to proceed to finally

12  determine the claim on a class-wide basis.  Thus, the court will make findings specific to this

13  case, unless otherwise stated in the discussion, and the undersigned will detail the significance of

14  the findings to the case as a whole.

15         Wall was a Medicare beneficiary and was injured in a car accident on September

16  18, 2003.  Pursuant to the Medicare Secondary Payer provisions ("MSP"), Medicare funded, in

17  part, plaintiff's accident related medical expenses because the insurer for the other driver,

18  Explorer, was not expected to pay promptly, or possibly at all.  Although it is not precisely

19  known how Medicare was contacted about plaintiff's accident related medical expenses or the

20  prospect of primary payment by Explorer, in all probability, a provider contacted Medicare as

21  Medicare was billed and there may well be payment penalties if the providers do not.

22  Medicare's contractor, United Government Services, Inc. ("UGS"), in or about September 2004

23

24         [8]  The court does not include the Secretary's characterization of plaintiff's counsel's "argument" of disputed facts as an objection.  It is true that many of the "disputed" facts are not
25  disputed at all; rather, plaintiff's counsel argues different slants or additions to the facts and then calls the basic fact "disputed."  The undersigned will not be held hostage to unreasonable
26  allegations of disputed facts, but there is no need to tediously list all of those here.

informed plaintiff that due to the Medicare accident related payments made, it "conditionally" had a claim of $2106,78, see Secretary Exhibit 4 and UMF 11[9], against any proceeds she received from a third party liability award.  Plaintiff executed a settlement agreement with Explorer on or about  November 14, 2004.  UMF 15; Secretary Exhibits 8 and 11.[10]  Plaintiff's counsel requested the insurer, by letter of November 19, 2004, not to have Medicare included as a payee on the check, Exhibit 11; nevertheless, it is undisputed that Medicare was placed as a payee on the check (see Secretary Exhibit 12).  Explorer issued the settlement check for $15,000[11] on or about November 19, 2004.  Up to the latter part of  December 2004, attempts were made to work out amounts due to Medicare, but the parties take irreconcilable positions on the efficacy of such attempts.  Secretary Exhibits 5, 14 .[12]

Plaintiff supplied information regarding the settlement to UGS on December 2, 2004, Secretary Exhibit 12, and further information on December 7, 2004.  Secretary Exhibit 13. Within 30 days of receipt of even the initial information, UGS issued its non-conditional "initial

---

[9]  The precise amount is disputed, but appears to be $2106.78

[10]  Plaintiff signed a release of all claims on this date; whether the "settlement" was executed precisely on the 14th is immaterial.

[11]  The check listed four co-payees: Pamela and Mark Wall, Bronson & Associates, and Medicare.

[12]  The court supplies the following information taken from the Secretary's papers.  The chronology is supported by exhibits and the Price declaration, which is effectively unrefuted in these specifics.  The chronology demonstrates that quite a bit of back-and-forth took place.
In September, 2004, Medicare provided plaintiff with a Payment Summary which itemized  conditional payments, including provider name, dates of service, diagnosis codes, total charges, Part A and B reimbursements, and total to be reimbursed.  Def.'s Ex. 4.  Plaintiff was informed in September and November, 2004, how to challenge conditional payments but did not make a proper written challenge.  Def.'s Ex. 5.  She also did not request an updated Payment Summary before she settled with Explorer.  Def.'s Ex. 5, p. 1.  When plaintiff executed the settlement agreement with Explorer, she did not make any changes to it, but only requested that Medicare not be named a payee on the check after the agreement was executed.  Def.'s Ex. 11. Plaintiff did not notify Medicare of the settlement until December 2, 2004, more than two weeks after the November 14, 2004 settlement date.  Def.'s Exs. 8, 12.  Between December 2 and 29, 2004, Medicare recorded more than twenty entries of discussions between plaintiff and defendant in regard to plaintiff's case.  Def.'s Ex. 5.  Medicare issued its initial determination on December 29, 2004.

1   determination" [of monies owed to Medicare] [13] on or about December 29, 2004, and now

2   claimed $6,319.53 in conditional payments, reduced by formula on account of attorneys' fees to a

3   requested payment of $4,199.33.  Secretary Exhibits 16, 18.  Clearly, appellate rights information

4   was included in the December 29, 2004 letter from UGS to plaintiff's counsel.  As explained in

5   the December 29 letter and legal discussion, *infra*, payment on the MSP claim was due within 60

6   days thereafter.

7            In order to make a summary judgment motion nearly impossible, and continue this

8   action into the next decade, the parties make mole hills out of a mountain of much immaterial

9   evidence regarding the partially case dispositive issue of whether Medicare, through its

10  contractor or otherwise, "requires" Medicare to be inserted on a third party claim settlement

11  check as a payee.  Sifting through all this paper, and in conformance with the legal discussion,

12  *infra*, the undersigned finds that for all practical purposes in any case where it is not possible to

13  make an "initial determination" prior to issuance of a settlement check (this case), any insurance

14  company paying a third party claim by a Medicare beneficiary, who received medical payments

15  by Medicare as a result of the incident giving rise to the third party claim, would understand that

16  it should, as a practical necessity, name Medicare as a payee on a third party settlement check in

17  order to stave off significant penalties and interest in the event that the Medicare beneficiary

18  refused to reimburse Medicare in whole or in part.  See legal discussion, *infra; see also*

19  September 14, 2004 letters sent to Explorer Insurance Co. and plaintiff's counsel by CMS

20  (Centers for Medicare and Medicaid Services) regarding Explorer's obligations: "Medicare's

21  claim must be paid *up front* out of settlement proceeds *before any distribution occurs.*

22

23          [13] "Initial determination" is a term of art here.  Up to the time an "initial" determination is
    made, the Medicare contractor will have been making preliminary, tentative calculations as to
    what may ultimately be owed to Medicare.  One might think generally (but erroneously) that
24  these comprise the initial determinations.  However, these preliminary calculations are just that–
    often incomplete/disputed, and in any event, the final settlement information will not have been
25  transmitted to the contractor for purposes of the "initial" determination.  The "initial"
    determination is actually a final determination subject to change because of further negotiations
26  or formal due process procedures.

1   September 14, 2004 letters to Explorer and plaintiff's counsel attached (without tabbing) in the

2   "Declaration of Martha" filed August 22, 2008 (emphasis added) (the same letter included in

3   Secretary Exhibit 3; Singleton Declaration at para. 13; Secretary Exhibit 10 (letter from Explorer

4   to plaintiff's counsel: "We are *required to name Medicare on the check* since they have asserted

5   a lien." (emphasis added))  For purposes of *this* motion with *this* plaintiff, the undersigned finds

6   as undisputed that, although the law does not expressly require the addition of Medicare as a

7   payee on checks, Medicare was inexorably added as a payee due to the legal implications

8   accruing to "primary payers" if they do not do so.  In other words, given the legal constraints on

9   primary payers, and what is clearly communicated to them by Medicare operatives, the court

10  finds a clear de facto, government policy of "encouraging" Medicare being named as a payee on

11  third party checks that was operating in this case (and inferentially nation-wide).  It is undisputed

12  in this case that Explorer followed that policy in this case, Secretary Exhibit 9, and the instant

13  summary judgment motion involves this case.[14]

14          Nevertheless, despite the check having been issued in November of 2004, and the

15  "initial" determination being issued on December 29, 2004,  plaintiff's attorney did not further

16  communicate with UGS until her letter of April 11, 2005 in which she further attempted to

17  negotiate an appropriate amount that was due to MSP reimbursement.  Secretary Exhibit 19.  The

18  record does not reflect the precise reason why plaintiff delayed for this 4 ½ month period in

19  further communicating, or in holding the check.  Perhaps plaintiff and her counsel were upset

20  with Medicare/UGS, but this delay cannot be laid upon the Secretary.  Becoming concerned that

21  the settlement check would not be negotiable, plaintiff then forwarded the plaintiff-endorsed

22  check to UGS to be cashed by Medicare on April 21, 2005.  Secretary Exhibit 20.  UGS sent a

23  refund check of $10,674.69 in non-MSP monies approximately two weeks later on May 3, 2005.

24  _____

25          [14] In those situations where Medicare and the Medicare beneficiary have completely
    agreed what is owed to Medicare prior to the issuance of an insurance check, i.e., the parties have
    agreed on the "initial" determination, it may well be possible to have two checks issued: one to
26  Medicare and one to the beneficiary.  This case does not involve that situation.

1   It is undisputed that Medicare, if only for this relatively short time period, had actual possession

2   of the entire $15,000 settlement – MSP monies and non-MSP monies alike.

3          The parties then engaged in further post-deprivation procedures which resulted in

4   further refunds to plaintiff during the year 2005.  At worst, plaintiff contends now that a little

5   over $9 is owed to her (but she is not seeking damages).

6          C.   The Controlling Law

7          42 U.S.C. § 1395y defines exclusions from Medicare coverage and Medicare's

8   rights as a secondary payer.  The primary payer of the beneficiary, or the other party liable to the

9   beneficiary in this case, is the private insurer/entity responsible for the payment; however, if that

10  insurer is not expected to pay promptly, Medicare will make payments for medical expenses,

11  "conditioned on reimbursement to [Medicare] in accordance with" the other provisions of the

12  statute.  42 U.S.C. §1395y(b)(2)(B)(i).  The primary plan is required to reimburse Medicare for

13  payments made on its behalf.  42 U.S.C. §1395y(b)(2)(B)(ii).  The language of the statute is

14  mandatory.  The primary plan "shall reimburse" the Secretary.  Id.  Medicare's right to

15  reimbursement accrues when information regarding the settlement[15] has been transmitted to

16  Medicare (or its contractor), and a "final" calculation of monies to be reimbursed to Medicare is

17  made, aka, the "initial" determination, and the reimbursement is due within 60 days of this date.

18  42 U.S.C. § 1395y(b)(2)(B)(ii); 42 C.F.R. § 411.24(h).[16]  In fact, if payment is not made before

19  ────────────────

20         [15]  Settlement would encompass any type of agreed payment by a primary insurer and
    could also include an arbitration or court judgment.  For the purposes of this case "settlement"
21  will be used.

22         [16]  There is some confusion about the accrual of the 60 day deadline.  The Secretary sets
    forth in his brief at page 4 that "[b]eneficiaries are instructed not to send monies until the initial
23  determination is issued," and that "The MSP reimbursement is not due until 60 days after the
    initial determination and third party payment are received."  Well, which is it?  The third party
24  payment in this case was known to the primary payer and received by the beneficiary about a
    month prior to the issuance of the initial determination.  The controlling statutory provision and
25  regulation would indicate that reimbursement is due either based on the date the primary payer
    receives information about the settlement's terms, or the date the beneficiary receives the
    settlement; the authority does not reference the "initial" determination.

26         A primary plan's responsibility for such payment may be demonstrated by a

1  the sixty day period for doing so expires, the Secretary may charge interest until reimbursement

2  is made.  Id.  The government has a right of action against "any and all entities" responsible to

3  make payment under a primary plan, and may recover double damages from any entity which has

4  thwarted this governmental right.[17]  42 U.S.C. §1395y(b)(2)(B)(iii).  The United States also has

5  subrogation rights which extend to the beneficiary's right to recover from the primary payer, and

6  to any judgments or settlements related to injuries for which Medicare has paid medical costs.  42

7  U.S.C. §1395y(b)(2)(B)(iv); 42 C.F.R. § 411.37 (2006).

8          The subrogation rights at issue constitute a lien on proceeds received from a

9  tortfeasor or insurance of a tortfeasor.  Walters v. Leavitt, 376 F. Supp. 2d 746, 750 (E.D. Mich.

10  2005) (referring to the MSP right as a "subrogation lien"[18]); Steinfeld v. Gullette, 2006 WL

11  1663842 (S.D. Ind. 2006).  Indeed the lien is superior to any other claim.  United States v. Geier,

12  816 F. Supp. 1332 (W.D. Wis. 1993).  This law tracks the nearly universal law that a right to

13

14          judgment, a payment conditioned upon the recipient's compromise, waiver, or
          release (whether or not there is a determination or admission of liability) of
15          payment for items or services included in a claim against the primary plan or the
          primary plan's insured, or by other means. If reimbursement is not made to the
16          appropriate Trust Fund before the expiration of the 60-day period that begins on
          the date notice of, or information related to, a primary plan's responsibility for
17          such payment or other information is received, the Secretary may charge interest
          (beginning with the date on which the notice or other information is received) on
18          the amount of the reimbursement until reimbursement is made (at a rate
          determined by the Secretary in accordance with regulations of the Secretary of the
19          Treasury applicable to charges for late payments).

20  42 U.S.C. § 1395y(b)(2)(B)(ii).
                                    ***
21          (h) Reimbursement to Medicare. If the beneficiary or other party receives a
          primary payment, the beneficiary or other party must reimburse Medicare within
22          60 days.
     42 C.F.R. § 411.24(h).
23  However, there is no need to finally determine this oddity as the issue is not controlling on this
     motion.
24

25          [17]  There is also a private right of action.  42 U.S.C. §1395y(b)(3)(A).

26          [18]  For the reasons expressed in previous proceedings herein, the exhaustion question in
     that case was decided inconsistently with Ninth Circuit law.

                                    14

subrogation, even without a contract, creates an equitable lien.  See Sereboff v. Mid Atlantic Medical Services, 547 U.S. 356, 368, 126 S.Ct. 1869, 1877 (2006) ("A subrogation lien 'is not an express lien based on agreement, but instead is an equitable lien impressed on moneys on the ground that they ought to go to the insurer'"); Allstate Ins. Co. V. Hughes, 358 F.3d 1089, 1092 (9th Cir. 2004) (interpreting Washington law: "[S]ubrogation creates in the insurer, by contract or equity, a right to be reimbursed. The enforcement of the interest [is] by a type of lien against the subrogor/insured's recovery from a tort-feasor or by an action by the subrogee/insurer in the name of the insured against the tort-feasor.")

It is a statutory requirement that an insurer or group health plan report new MSP occurrences to Medicare based upon both its direct priority right of recovery and its subrogation rights.  42 U.S.C. §1395y(b)(7).  Furthermore, if the claim is resolved through a settlement, judgment, award or the like, the insurer must submit the information to Medicare when final resolution is reached.  42 U.S.C. §1395y(b)(8).

Thus, it is only through the exercise of an extreme formalism, even stubborness, that the Secretary can state that Medicare is not "required" to be named as a payee on third-party settlement checks in a situation where the settlement check will be issued prior to an initial determination.  In this case, Explorer was told that Medicare had a right to the money *before* distribution of any proceeds, Explorer believed that it was *"required"* by law to place Medicare on the check as a payee, and the provisions of the law, supra, require the conclusion that any insurer with an ounce of business sense would include the lienholder Medicare as a payee on the one check when it has been notified of an MSP situation.  Because in a great many cases the settlement check will be issued before the initial determination, there is no practical way to issue two checks – one to Medicare for the "TBA" initial determination amount, and the remainder to the Medicare beneficiary.  It follows then that Medicare, indisputably in this case, and assuredly in a great many cases, obtains actual or constructive control of the entire amount of settlement proceeds because the check cannot be cashed until the last endorsee, Medicare, has signed off on

the check.[19]  See MSP Manual, Chapter 7, § 50.5.4.3.B, Docket #180 at 83-84 ("If a liability

insurer sends the Medicare contractor a check intended to repay Medicare benefits paid on the

beneficiary's behalf, but which is made out jointly to the contractor (or Medicare) and to other

parties, such as the beneficiary or representing attorney, the contractor sends a note to the other

payee(s) asking them to endorse the check and return it to the Medicare contractor.  It does not

endorse the check before the endorsement of the other payee(s) is received. .... If ... the other

payee(s) refuses to endorse the check and return it to Medicare, the contractor refers the check to

the RO."); www.msprc.info (same)

D. Pre-Deprivation Due Process

Plaintiff does not contend that Medicare was not entitled to MSP reimbursement

at the earliest practical opportunity; she claims that Medicare's procedures require the "handing

over" of non-MSP monies to Medicare, monies which no one contends Medicare is entitled to,

prior to any meaningful due process.  Given that Medicare obtained non-MSP monies from

plaintiff's settlement, for however long or short, the issue becomes – can Medicare

constitutionally do this.  The claim actually involves two interrelated aspects: (1) the

determination of an MSP amount and the taking of that MSP amount subject to later

negotiation/appeal; (2) the taking of indisputably non-MSP monies and holding them, as in this

case for a short while, prior to return of such monies to the Medicare beneficiary.

To state a procedural due process claim, plaintiffs must allege: (1) a liberty or

property interest protected by the Constitution; (2) a deprivation of the interest by the

government; and (3) lack of process.  See Wright v. Riveland, 219 F.3d 905, 913 (9th Cir. 2000).

In analyzing a claim for violation of the right to procedural due process, the

threshold inquiry is whether defendant's conduct infringed a protected interest.  Once this initial

_____

[19]Again, there are conceivable situations where the settlement check is not issued prior to
the time Medicare could issue its "initial" determination; in such a case two checks could be
issued, if the Medicare beneficiary accepted the determination, or just decided to fight it later.
Those situations are not at issue in this case.

1   test is met, the court must then assess whether the process provided by defendants was

2   constitutionally adequate.  See Hewitt v. Helms, 459 U.S. 460, 468, 103 S.Ct. 864 (1983);

3   Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903 (1976).  "An important government

4   interest, accompanied by a substantial assurance that the deprivation is not baseless or

5   unwarranted, may in limited cases demanding prompt action justify postponing the opportunity

6   to be heard until after the initial deprivation."   Fed. Deposit Ins. Corp. v. Mallen, 486 U.S. 230,

7   240, 108 S.Ct. 1780, 1787-88 (1988).  "[W]here pre-deprivation process is feasible, it must be

8   afforded before a person may be deprived of a protected interest."  Finkelstein v. Bergna, 924

9   F.2d 1449, 1452 (9th Cir.1991).

10        The Supreme Court has ruled that pre-deprivation procedures need not be

11   elaborate and are satisfactory if there is the opportunity "to present reasons, either in person or in

12   writing, why proposed action should not be taken...."  Cleveland Bd. of Educ. v. Loudermill, 470

13   U.S.  532, 545, 105 S.Ct. 1487, 1495 (1985).  When a full post-termination hearing is available,

14   the pre-termination hearing may be highly informal.  Loudermill, 470 U.S. at 546, 105 S. Ct. at

15   1495.  Thus, Loudermill's requirement of a meaningful opportunity to respond in a

16   predeprivation context entails merely the right to be informed of the "substance of the relevant

17   supporting evidence."  Brock v. Roadway Express, Inc., 481 U.S. 252, 264, 107 S. Ct. 1740,

18   1748 (1987) (plurality opinion).  Moreover, the predeprivation hearing "need not definitely

19   resolve the propriety of the [deprivation], but should be an initial check against mistaken

20   decisions ...."  Loudermill, 470 U.S. at 545, 105 S. Ct. at 1495.  See also Levine v. City of

21   Alameda, 525 F.3d 903, 906 (9th Cir. May 13, 2008) (finding full post-termination hearing

22   required because plaintiff given no opportunity to respond prior to termination and citing to

23   Loudermill which noted that "adequacy of pretermination and post-termination hearings are

24   interrelated and that the scope of one affects the scope of the other").

25        The three part test to be considered in determining whether administrative

26   procedures are constitutionally sufficient before a property deprivation occurs was set forth in

1    Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893 (1976).  It requires consideration of  "(1) the

2    private interest that will be affected by the official action; (2) the risk of an erroneous deprivation

3    of such interest through the procedures used, and probable value, if any, of additional procedural

4    safeguards; and (3) the Government's interest, including the fiscal and administrative burdens

5    that the additional or substitute procedures would entail."  Id. at 321.  Avoidance of extra costs

6    associated with pre-deprivation hearings, as well as the government's interest in assuring safe

7    health care for the public, have been held to be compelling governmental interests.  Varandani v.

8    Bowen, 824 F.2d 307, 311 (4th Cir. 1987).  Also held to be compelling is the government's

9    interest in collecting revenues.  Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 2000 (1972).

10           Turning to the threshold "property interest" inquiry, to the extent that the

11   Secretary contends that non-MSP monies are not a property interest of plaintiff, the contention is

12   frivolous.  See Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011 (1970).  The Secretary appears to

13   believe that money is not property, or that deprivation of someone else's property, if only for a

14   short while, is absolutely lawful without question.  No authority is cited for such  propositions.  It

15   would be as if to say that in a house sale, the seller has no property interest in the proceeds of sale

16   over and above what is owed to the lienholder, and that the lienholder can retain the entire

17   proceeds for whatever time period suits the lienholder.

18            To the extent that the Secretary contends that plaintiff has no property interest in

19   the MSP monies, such a contention turns on the notion of what subrogation means in terms of

20   MSP monies being an equitable lien, i.e., does the lien extinguish a Medicare beneficiary's  right,

21   title, or interest in the monies which are earmarked to be paid to Medicare.  It is not the function

22   of this motion for summary judgment to precisely define the legal extent of the "equitable lien,"

23   suffice it to say, that in the absence of an express assignment, legal title often remains in the

24   hands of the person entitled to it by the face of the property at issue.  Cretcher-Lynch v. National

25   Council on Compensation, 149 F.3d 817, 819 (8th Cir. 1998); Fed. Deposit Ins, Co. v.

26   Mademoiselle of Cal., 379 F.2d 660, 665 (9th Cir. 1967).  This legal title would certainly

18

constitute a property interest.   The matter is further complicated in that the equitable lien in this case (as it will be in many cases) is inchoate at the time the settlement check is issued – the precise amount owed as MSP monies is not known.   The Secretary cannot logically contend that the portion of the initial demand subsequently determined to be non-MSP, on account of a determined error in the initial demand, was not all along property in which the beneficiary had a property interest.

Therefore, the undersigned concludes that plaintiff has a property interest (to varying degrees) in the total amount of the settlement at the time the tortfeasor's insurance company pays the settlement amount.  This brings the due process analysis to the nature of the government's interest in utilizing the procedures which it does, the nature of the harm to plaintiff, and the nature of the pre-deprivation and post-deprivation procedures.

Given the legal discussion above concerning the need for the MSP legislation exhibited thereby, the compelling interest of the government in ensuring the solvency of the Medicare program (especially today where we are often warned that Medicare will run out of money in the near future) can hardly be doubted.[20]

The Secretary has carefully set forth the policy behind this statute.  In 2002, when testimony was taken before the Senate Finance Committee in regard to regulation of Medicare, it was revealed that in that year alone Medicare planned to pay approximately $240 billion for health care of almost 40 million beneficiaries.  Def.'s Request for Judicial Notice ("RJN"), Ex. C.  Therefore, the financial viability of Medicare is dependent on its being reimbursed.  The Medicare Secondary Payer Statute[21] was enacted in order to preserve Medicare's financial integrity, curb skyrocketing Medicare costs, and reverse the payment order so that liability

---

[20] See e.g., *Medicare's Insolvency Creeps Closer*, www.webmd.com/medicine/news 20060502: "Medicare's trust fund will run out of money in 2018, two years earlier than previously expected, the program's trustees reported Monday."

[21] The statute is codified at 42 U.S.C. § 1395y.

insurers and others are the primary payers where there is overlapping insurance coverage, rather than Medicare.  Zinman v. Shalala, 67 F.3d 841, 843 (9th Cir. 1995).  Where it is clear that an insurance company will pay for these costs, the government should not pay the medical bills.  Evanston Hosp. v. Hauck, 1 F.3d 540, 544 (7th Cir. 1993).  See also Thompson v. Goetzmann, 337 F.3d 489, 495 (5th Cir. 2003) (defining purpose of Medicare Act to "reduce Medicare costs by making the government a secondary provider of medical insurance coverage when a Medicare recipient has other sources of primary insurance coverage").  If Medicare does provide coverage conditionally on behalf of another payer, this coverage is conditioned on reimbursement.  42 U.S.C. § 1395y(b)(2)(B)(i).

        The importance of the MSP provisions were also set out in United States v. Grier, supra at 816 F. Supp. 1332.  The legislative history referenced therein strikingly supports the importance of the MSP statutory scheme.  Indeed, if as the court held, the MSP subrogation entitles Medicare to a priority of recovery over all other liens as a matter of federal preemption, it is difficult to overstate the Congressional intent to find a compelling need to seek reimbursement of all monies possible under the law.

        This is not to say that a Medicare beneficiary's interests are unimportant, especially with respect to the amount of non-MSP money that was effectively withheld.  Tort settlements often pay non-Medicare paid medical bills, not to mention a host of other conceivable expenses.  If the non-MSP money is withheld for any significant length of time, significant hardship may result.  Such may not have been the case in plaintiff's situation, as she perversely held onto the check almost to the point of its expiration before making any attempt to get reimbursed for any non-MSP money.

        However, in assessing the weight of the interests involved, Medicare's interests in maintaining a solvent medical care system for all senior Americans outweighs the temporary upset to individual beneficiaries.  Obviously, when necessary, Medicare opts for a "take now, figure out final resolution later," approach as it beggars common sense not to understand that the

collection difficulties for Medicare would be *much* more difficult and *much* less efficacious if beneficiaries were given complete freedom to spend all their settlements, if even for legitimate bills, prior to the time Medicare *might* get repaid.  Plaintiff's "pay later" approach would completely negate the legal priority of Medicare's rights to MSP monies included within a tort settlement, Grier, supra.  Requiring a full evidentiary hearing prior to relinquishing third party proceeds to Medicare would place an enormous financial and administrative burden on the government which is not justified in light of the compelling government interest.  See Nelson v. Diversified Collection Services Inc., 961 F.Supp. 863, 870 (D. Md. 1997).  As the statute makes clear, Medicare beneficiaries agree when they choose to accept benefits that MSP payments are conditioned on reimbursement to the Trust Fund.  42 U.S.C. § 1395(y)(b)(2)(B).

While recognizing in many cases, that including Medicare as a payee on one check (which realistically means that Medicare must ultimately negotiate the check and place all the MSP and non-MSP money in its accounts), will inevitably cause a delay in return of non-MSP monies to a beneficiary, there appears to be no other viable mechanism with which to retain Medicare's priority of recovery on MSP monies.[22]  In this case, plaintiff sent the settlement check (issued by Explorer in December 2004 prior to an "initial" determination) to Medicare on April 22, 2005; it was received by UGS (Medicare contractor) on April 25, 2005, and a reimbursement check for those monies which neither party contended were subject to an MSP lien was sent to plaintiff on May 3, 2005.  Due process must recognize some administrative grace period in which the government must perform its mandatory duties.  A time period for return of undisputed non-MSP monies of up to 30 days from time of check receipt by Medicare would not be unreasonable

---

[22]  Again, the Secretary is correct that in *some* cases, the settlement amount may be known sufficiently before a settlement check is issued, that the check issuer can be informed of the undisputed non-MSP amount such that two checks can be issued – one for the alleged MSP amount owing and the undisputed non-MSP amount (in which Medicare would not be named as a payee).  In such a situation, Medicare will never have possession of the undisputed non-MSP monies.  However, there obviously exist a significant number of cases, such as the one involving plaintiff, where timing logistics do not permit the issuance of two checks.

from a due process standpoint.

"Property rights must yield provisionally to governmental need." Phillips v. CIR, 283 U.S. 589, 595, 51 S.Ct. 608, 611 (1931) (involving collection of tax monies prior to a hearing). Clearly, in tax situations the government retains monies to which it, in actuality, was never entitled. An example familiar to most Americans would be the withholding of income for tax purposes. For events beyond either party's control, e.g., a layoff from employment, the government may retain collected monies prior to the layoff which will indisputably be over and above any potential tax liability for the entire year. As we all know, no refund is issued until the next tax season. No reasonable person contends, however, that the government has violated due process in such a withholding situation. See also e.g., Lujan v. G & G Fire Sprinklers, Inc, 532 U.S. 189, 121 S.Ct. 1446 (2001) (permitting the retention of wages and penalties by state government assertedly owed pending legal resolution.

Finally, plaintiff purports to attack the pre-deprivation policies as applied by referring to delayed refund problems encountered by an attorney in Mississippi (Fewell). No class action has been certified, but the alleged problems demonstrate the paucity of merit to the ultimate due process *policy* problems asserted by plaintiff herein. The Fewell evidence has all the earmarks of special problems in a special case that has nothing to do with policies applied across the board to Medicare recipients, and nothing to do with plaintiff's situation herein in which she was issued a refund of undisputed non-MSP monies 8 days after receipt by UGS. Plaintiff's action cannot remain viable simply because of potential bureaucratic problems of unknown origin involving others.[23]

The ultimate balance of these interests depends on the nature of the proceedings in which resolution of disputes concerning the reimbursement monies is made. Taking the formal post-initial determination procedures first, no real issue exists. Plaintiff does not attack the

---

[23]And, of course, a class action would not be certified for a myriad of individual problems in dealing with Medicare contractors.

availability of meaningful post-deprivation procedures as they *facially* appear.  After the initial

determination, the beneficiary may request reconsideration.  After the reconsideration, the

beneficiary may request a hearing before an ALJ, and thereafter appeal to the Medicare Appeals

Council, followed by the filing of a lawsuit in federal court.  42 U.S.C. § 1395ff(b)(1); 42 C.F.R.

§ 405.904(a).  The appeals process, including a request to waive all of the MSP repayment, is

spelled out in the initial determination letter.  Secretary Exhibit 18.  Plaintiff could not

legitimately contend that the facial provisions for "afterwards" review are insufficient.

The actual chronology and effectiveness of these procedures in plaintiff's case is

beyond the scope of this summary judgment.  However, even assuming that they were ill applied

in plaintiff's case, and in other cases, the remedy is an injunction to enforce the facially

satisfactory procedures, not to change the entire structure of the MSP program with respect to

priority of MSP reimbursement.

The issue of pre-deprivation due process is a bit more difficult to decide on

summary judgment.  As set forth above in the legal discussion, pre-deprivation due process

procedures must also be available if they can be feasibly implemented.  Feinkelstein, supra.

However, these procedures need not be elaborate or formal.  See Memphis Light, Gas and Water

Division v. Craft, 436 U.S. 1, 16 n. 17, 98 S.Ct. 1554, 1564 n. 17 (1978) (finding requirement of

pre-deprivation hearing satisfied by "opportunity for informal consultation with designated

personnel empowered to correct a mistaken determination").

Although many difficulties exist in setting up a pre-deprivation due process

mechanism, e.g., the amount owed in reimbursement is often a moving target prior to the

issuance of the initial determination, given the length of time involved prior to issuance of an

initial determination, opportunities for informal contact exist.  The Secretary does not dispute

this; indeed, the Secretary heralds its ability to correct mistakes prior to issuance of the initial

determination.  When a possible MSP claim is identified by Medicare, a file is opened, and the

beneficiary is sent a notification letter reminding the beneficiary of his or her rights and

1  obligations.  Conditional payment information ("Payment Summary[24]"), to the extent available,

2  may be provided to the beneficiary at this time.  Price Decl. ¶ 4.  Such a summary, dated

3  September 21, 2004, was provided to plaintiff.  Def.'s Ex. 4.  Medicare responds to challenges of

4  included expenses at any time.  Price Decl., ¶ 4.  According to the Price declaration, "[u]pon

5  request, interim letters are sent with an updated Payment Summary whether or not settlement is

6  imminent.  Beneficiaries can challenge conditional expenses upon receipt of the interim letters

7  and payment summary.  UGS investigators, including myself, would adjudicate challenges upon

8  receipt.  UGS strived to respond to inquiries within 45 days."  Id.  The MSP manual confirms

9  that "contractors shall acknowledge and respond to all correspondence within 45 calendar days

10  from the date of receipt... absent instructions to the contrary ...."  (Def.'s RJN Ex. B  41).

11  Beneficiaries can also access their account information at any time by going to

12  www.mymedicare.gov. [25]  As set forth earlier, plaintiff does not (and cannot) directly dispute

13  these facts.

14          Superficially, plaintiff presents facts to counter the Secretary's showing, but on

15  thorough analysis, material issues of fact are not presented.

16          The court accepts, for the purposes of this motion, plaintiffs' evidence that

17  Medicare attempts to match medical entries to be included in an MSP claim by using computer

18

19  [24] Payment summaries itemize all conditional payments, including provider name, dates of service, diagnosis codes, total charges, Part A and B reimbursements, and total to be reimbursed.  Price Decl., ¶ 4.

20

21  [25] Defendant's facts indicate that plaintiff wrote a letter to Medicare on December 2, 2004 attempting to resolve disputes but did not comply with instructions given.  Def.'s Exs. 5,

22  12.  On December 3, 2004, UGS called plaintiff regarding her letter.  Def.'s Ex. 5.  On December 9, 2004, plaintiff's attorney called UGS, saying "'it wasn't  worth the effort' to send us 'all' the settlement details I explained to her we needed to be able to send a demand."  Id.  Plaintiff's

23  attorney sent a letter with information needed to finalize the MSP claim but did not challenge conditional payments.  Def.'s Ex. 15.  On December 27, 2004, UGS sent plaintiff a letter for her

24  review, with its revised conditional payment, and attached a list of claims used to arrive at the revised amount.  Plaintiff was requested to respond if the information was incorrect.  Def.'s Ex.

25  16.  On December 28, 2004, plaintiff and UGS had a phone conversation wherein UGS declined to remove certain expenses, but plaintiff's counsel stated that although she disagreed with some

26  of the claims, she wanted UGS to issue the demand.  Def.'s Ex. 5 at 2.

generated matching processes, and that case analysts are not instructed to analyze what entries

should or should not be included in an MSP claim.  Singleton Decl., ¶12 (Docket #179).  The

criteria for computer determination is based on medical diagnosis codes and payment date after

the MSP incident.  Id., ¶ 7.  See also MSP Manual, Chapter 6, §§ 40.1, 40.2 (Docket #180 at 111-

12.)  It is readily apparent from plaintiff's records that Medicare initially did deprive plaintiff of

property that was clearly hers.  For example, the payment summary issued to plaintiff on

December 20, 2004 indicates entries for "(1) tobacco disorder; (2) diabetes; (3) vaginisum; (4)

interstitial cystitis; (5) eyelid inflammation; (6) sinitus; and (7) a suspected heart attack

hospitalization which occurred eight months post 9/18/03 accident."  Singleton Decl., ¶ 11.  In

other words, in plaintiff's case, as in many cases, initial over-retention of non-MSP monies is

going to occur.  These type of mistakes require a process whereby a beneficiary gets to

informally complain that Medicare is "over-relating" ailments to accidents such that, if not

corrected, Medicare will receive reimbursement to which it is not entitled – at least for a time

period.

Plaintiff then further posits the Singleton declaration which provides at 7: "With

respect to the timing of making corrections to the MSP claim that would be brought to MSPRC'S

[Medicare national contractor] attention through correspondence and phone calls, we were told

by MSPRC that no corrections are to be made until *after* an initial determination on the MSP

amount (Demand letter) is made."  The problem with this declaration is that Singleton did not

work for UGS, and the years that he worked as a Medicare contractor employee for another

contractor is unknown from his declaration.[26]  On the other hand, declarant Price worked for

UGS (the contractor at issue here), and had personal knowledge of the Wall case.  That *Wall* had

access to pre-deprivation due process remains undisputed.  See also Secretary Exhibit 5 which

corroborates the Price declaration at least with respect to advising plaintiff's attorney to submit

---

[26]  However, given the fact that MSPRC was not created until October 2006, Singleton's
work would have been performed well after plaintiff's case was handled by UGS.

1    her diagnosis-relation-to-accident disputes in writing.  The fact that no resolution was reached

2    pre-determination in plaintiff's case is not controlling; the fact that plaintiff had access to and

3    participated in informal procedures is controlling.

4            Moreover, *plaintiff's own exhibit* attached to the Martha [Bronson] declaration,

5    although it assists in raising a superficial question concerning Price's authority to negotiate

6    anything with respect to reimbursement dispositively rebuts plaintiff's contention that no

7    informal contact with anyone working for Medicare for the purpose of pre-initial determination

8    reimbursement negotiation is permitted:

9    **50.4.2-Pre-Settlement Negotiations, Compromises, and Discussions with Beneficiaries/Attorneys**
     **(Rev. 1, 10-01-03)**

10   The Federal Claims Collection Act grants Medicare the right to compromise its
     claims, or to suspend or terminate its recovery action.  However, only CMS

11   claims collections officers may take this action.  Consequently, contractors may
     not, under any circumstances, enter into negotiations (either pre-or post

12   settlement) with beneficiaries, or their attorneys or representatives, to compromise
     Medicare's claim.  If Beneficiaries, or their attorneys or representatives, wish to

13   discuss arrangements by which Medicare's claim might be reduced (outside of a
     formal request for Medicare to waive its claim), the contractor either:

14           > Instructs the party to either make its request for compromise in writing,

15   in which case the contractor forwards the request to its RO, or
             > Refers the party directly to the appropriate RO staff person (emphasis added)[27]

16

17   The precise meaning of the words "Medicare's claim" is not clear.  It could include any part of

18   the diagnosis relation-to-accident negotiation, or it may well mean only negotiation of the total

19   monetary amount of Medicare paid medical bills based upon undisputed diagnosis relation.  The

20   Secretary does not refer to this section, and plaintiff fails to explain it.  However, in either case,

21   the manual clearly authorizes pre-deprivation negotiation in an informal manner, albeit the

22   \\\\\

23   \\\\\

24   _____

         [27]Attorney Bronson did not reference this exhibit in her authentication declaration.

25   However, the undersigned has confirmed that it is part of the Medicare Secondary Payments
     (MSP) Manual.  See www.cms.hhs.gov/manuals, *Medicare Secondary Payments Manual (MSP)*,

26   Chapter 7, section 50.4.2.  The undersigned will take judicial notice of it.

1   negotiator with authority may be in dispute.[28]

2         In addition to challenging the initial determination any time prior to its issuance,

3   as well as within 60 days after it is made; 42 U.S.C. § 1395y(b)(2)(B)(ii); 42 C.F.R. § 411.24(h);

4   a Medicare beneficiary has the opportunity to take advantage of another pre-deprivation remedy –

5   to request a waiver of the MSP claim under the statute.  See 42 U.S.C. § 1395(b)(2)(B)(v) ("the

6   Secretary may waive (in whole or in part) the provisions of this subparagraph in the case of an

7   individual claim if the Secretary determines that the waiver is in the best interests of the program

8   established under this subchapter").  The court is unaware of any authority which precludes a

9   waiver request from being developed prior to the issuance of the initial determination.  In sum,

10   adequate pre-deprivation procedures exist such that the initial retention of MSP and Non-MSP

11   monies does not violate due process.

12         One other non-meritorious due process attack is made.  Plaintiff also claims that

13   defendant's policy which requires the beneficiary to prove that the medicals that defendant

14   claims in its "Payment Summary Form" are not related to an MSP case results in an

15   unconstitutional shifting of the burden of proof to plaintiff.[29]  In support, plaintiff cites Estate of

16   Urso v. Thompson, 309 F.Supp.2d 253 (D. Conn. 2004).  The Secretary is correct in the reading

17   of that case which states that although the Secretary maintains the ultimate burden on the issue of

18   whether Medicare's reimbursement request is overinclusive, plaintiff  is "in a better position as

19   an initial matter to evaluate the reimbursement claim and to assess whether a payment made by

20   Medicare was truly for an item or service that was ultimately paid by a primary plan."  Id. at 260.

21   The court implied that it made sense for the plaintiff to have the initial burden to make a prima

---

22       [28]  The several "me too" declarations filed by the attorneys of Medicare beneficiaries
23   attesting to several MSP bureaucratic snafus (occurring for unknown reasons) around the nation
       add nothing to Wall's case, and fail to take into account officially published pre-deprivation due
24   process procedures.

25       [29]  The declaration of Randy Singleton confirms this policy.  It states that case handlers
       are instructed to inform the beneficiary that he or she must submit documentation establishing
26   that claims are not related.  (Docket #179, ¶ 15).

1  facie case.  Id.  This procedure is not unlike Social Security disability cases where plaintiff has

2  the initial burden to come forward with medical evidence to support her claim for benefits

3  because she has greater access to her medical records.  See Bowen v. Yuckert, 482 U.S. 137, 146

4  n. 5, 107 S. Ct. 2287, 2294 n. 5 (1987) (holding that plaintiff bears the burden of proof in the first

5  four steps of the sequential evaluation process, and the Commissioner bears the burden if the

6  sequential evaluation process proceeds to step five).  The court concludes that no

7  unconstitutional shifting of burdens takes place as a result of plaintiff having to evaluate whether

8  a medical service was unrelated and taking some steps to correct the mistake.

9         E. Conclusion to Due Process Claim (Third Cause of Action)

10             Medicare MSP law and regulations set up a situation which inevitably will result

11  in many situations of Medicare's retention of undisputed, and/or ultimately determined, non-

12  MSP monies.  Although such raises a specter of unlawful governmental detention of property, for

13  the reasons stated herein, Medicare's Secondary Payment law, policies, and procedures withstand

14  facial due process attack in plaintiff's Wall's case, and generally.

15  *Remaining Causes of Action*

16         A. First Cause of Action

17             Plaintiff's first cause of action is that defendant violated the requirements for

18  initial determinations by failing to require UGS to provide timely, written and accurate initial

19  determinations on MSP claims in California, thus violating the Medicare statute and regulations

20  and procedural due process.  Compl. ¶¶ 55, 56.  Plaintiff explains that even though she found

21  errors in unrelated medicals from before the subject accident, UGS was not permitted to correct

22  them until after settlement was reached.  As a result, plaintiff claims that beneficiaries are

23  "without any recourse unless and until the case settles and payment is made."

24             To the extent that plaintiff is alleging here that no avenues for informal

25  consideration and rectification exist for erroneous conditional payment information (pre-issuance

26  of an initial determination), for the reasons expressed above, summary judgment should be

1  granted.

2         To the extent that plaintiff is alleging some violation of regulations and policies in

3  the processing of her claim, the undersigned has not ruled upon that claim herein.  However, in

4  further proceedings, because plaintiff is not seeking monetary recompense for any alleged

5  violation, plaintiff will be tasked with showing why the remainder of the First Cause of Action:

6  (1) is not moot;

7  (2) whether plaintiff finally exhausted her own particular complaints in this regard;

8  (3) a *policy* of action or inaction that may need to be corrected such that maintenance of a class

9  action is appropriate; issues of fact on a policy cannot be shown by a potpourri of attorney

10  declarations which merely conclude that such a policy, *de jure* or *de facto* exists because of their

11  "past experience," nor can it be demonstrated by unexplained incidents in which delay or some

12  other problem was encountered.

13         B.  Second, Fourth, Fifth, Sixth Causes of Action

14         Defendant contends that these claims concern post-deprivation issues that the

15  court already found were not appropriate for class consideration.  See Order, filed March 18,

16  2008.  The undersigned did not go so far as to make a definitive ruling.

17         The Second Cause of Action concerns "violation of requirements for

18  reconsideration requests."  The Fourth Cause of Action contends a  "violation of requirement to

19  send waiver forms and information upon written request."  The Fifth Cause of Action alleges

20  "violation of requirement to provide correct appeal information."  Finally, the Sixth Cause of

21  Action indicts the Secretary for "fraudulent back dating of initial determinations," thus

22  shortening the beneficiary's appeal period.

23         Plaintiff cannot legitimately contend that adequate administrative procedures to

24  resolve post-deprivation issues do not facially exist.  Therefore, in further proceedings, because

25  plaintiff is not seeking monetary recompense for any alleged violation, plaintiff will be tasked

26  with showing why the above identified causes of action:

1   (1) are not moot;

2   (2) whether plaintiff finally exhausted her own particular complaints;

3   (3) a *policy* of action or inaction that may need to be corrected such that maintenance of a class

4   action is appropriate; issues of fact on a policy cannot be shown by a *potpourri* of attorney

5   declarations which merely conclude that such a policy, *de jure* or *de facto* exists because of their

6   "past experience," nor can they be demonstrated by unexplained incidents in which delay or

7   some other problem was encountered.

8   CONCLUSION

9       Accordingly, IT IS RECOMMENDED that defendant's motion for partial

10  summary judgment motion, filed August 1, 2008, (docket # 166), be granted as to the Third

11  Cause of Action, and the First Cause of Action insofar as it alleges the non-existence of informal

12  procedures for challenging and rectifying a tentative requirement to repay Medicare for

13  conditional payments made prior to payment by a primary payer.  (These Findings and

14  Recommendations resolve the entire Docket # 166).

15      These findings and recommendations are submitted to the United States District

16  Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within ten

17  (10) days after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20  shall be served and filed within ten (10) days after service of the objections.  The parties are

21  advised that failure to file objections within the specified time may waive the right to appeal the

22  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23      IT IS HEREBY ORDERED: that the parties individually submit a proposed

24  scheduling for disposition of the remaining Causes of Action (Claims) in this lawsuit no later

25  \\\\\

26  \\\\\

1   than November 17, 2008.  The pretrial conference previously scheduled is vacated, as is the

2   previously scheduled trial date of February 24, 2009.

3   DATED: 10/29/08

4                                                        /s/ Gregory G. Hollows

5                                                        _____
                                                         GREGORY G. HOLLOWS
                                                         U. S. MAGISTRATE JUDGE

    GGH:076:Wallfinal

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26